LITTLETON & LAMAR *v.* LOAN, MERCANTILE AND STOCK ASSOCIATION, etc.

1. One who deals with a special agent, knowing at the time the limits within which the agent, under the terms of his appointment, has authority to bind his principal, is bound to act with reference to this knowledge, and cannot hold the principal liable for loss occasioned by acts of the agent in excess of, or contrary to, the latter's authority in the premises.

2. Where an agent to buy had no authority to make his principal directly liable to the seller for the price of the goods purchased, but was required to ship the same to the principal, draw upon the latter in favor of a specified bank, with bills of lading attached to the drafts, which drafts the principal had arranged with the bank to cash so as to supply the agent with money to pay for his purchases, one who, with knowledge of these facts, sold and delivered goods to the agent for his principal, and, without seeing to it that the agent complied with the above stated requirements, accepted in settlement for the goods the agent's individual check on the bank in question, which was dishonored, could not recover from the principal the value of the goods without proving affirmatively that he actually received them; and even then, the latter would not be liable if he in fact paid for the goods by honoring the agent's draft in pursuance of the terms under which the agency was created.

3. In view of the law as above announced, the evidence in this case did not warrant the verdict in the plaintiff's favor, and it was error to refuse a new trial.

*Atkinson, J.*, dissenting.—1. Where the relation established between a principal and agent is that of a general agency upon the part of the latter to purchase cotton upon the credit of the principal, the seller of cotton to such an agent for the account of the principal is not affected by private instructions of the latter to a third person, not affecting the power of the agent to purchase, but only directing how, in what manner and upon what terms such third person would be authorized to pay drafts drawn by the agent for the purchase price of such cotton, even though such private instructions be known to the seller.

2. If the agent have competent authority to complete the contract of purchase, and, in pursuance of such authority, the purchase be completed and delivery to the agent thereunder be effected, the seller is entitled to be paid the purchase price, notwithstanding the infidelity, negligence or disobedience of instructions by the agent in his further dealings with his principal respecting the delivery to the principal of the cotton so purchased.

3. According to the principles above announced, under the evidence submitted in this case, the court committed no error in refusing to grant a new trial.

October 5, 1895. Brought forward from the last term.

Complaint on account. Before Judge Fish. Sumter superior court. November term, 1893.

*Cutts & Hixon, J. H. Lumpkin* and *E. F. Hinton,* for plaintiffs in error. *Morgan McMichael, Brannon, Hatcher & Martin* and *C. J. Thornton,* contra.

LUMPKIN, Justice.

The record discloses that Littleton & Lamar, of Americus, had at Buena Vista an agent named Lowe, whose business it was to buy and ship cotton to them. They required him to ship daily the cotton he bought, and had arranged with a bank in Buena Vista to cash his drafts drawn upon them for purchases made, when the same were presented to the bank with bills of lading attached. Lowe had no authority, except as above stated, to draw upon his principals in settlement for any cotton purchased by him; and no authority at all, so far as Littleton & Lamar were concerned, to keep an account of his own at the bank and

draw upon it his individual checks in settlement of such purchases. All this appears from a letter addressed to the bank by Littleton & Lamar, of which the following is a copy:

"Buena Vista Loan & Savings Bank, Buena Vista, Ga.

"Sirs:—Mr. O. E. Lowe is in your town for the purpose of buying cotton for us, and we wired you to pay for his purchases, requiring him to ship daily, drawing cost with B/L attached. · We had his draft for $100.00 presented to us in your favor, for what he says is a 'bonus' you require, which we refused to honor. We hoped that our established credit here and at all the cotton ports would be sufficient guarantee for any transactions we might see proper to authorize; hence our refusal. If you see proper to pay for Mr. Lowe's purchases, requiring him to ship daily, with B/L attached to draft, we will always honor same.     Very respectfully,     Littleton & Lamar."

Short, as manager of the plaintiff corporation, sold to Lowe, as agent, a lot of cotton, and accepted in payment Lowe's individual check upon the bank, without requiring him to draw upon Littleton & Lamar with bills of lading attached. The check was dishonored by the bank, and thereupon the corporation of which Short was manager brought an action against Littleton & Lamar for the price of the cotton, and obtained a verdict for the same. It plainly appears from Short's own testimony as a witness that, before making the sale in question, he was fully aware of the nature and extent of Lowe's agency for Littleton & Lamar. The following is an extract from his testimony: "Before I sold any cotton to this party [Lowe], I was shown that letter that has just been read to the jury [referring to the letter above quoted]. I saw that letter. Mr. Lowe came to me and stated that he was there for the purpose of buying cotton for them [Littleton & Lamar]; that the bank had refused to pay for his cotton without a bonus, and he had a letter of credit at the bank that he thought was a sufficient

guaranty.   He applied to me to purchase cotton for them.
He referred me to this letter, and I went there and examined this letter."

There is no difference of opinion between the majority
of this court and Justice Atkinson, who dissents from the
judgment rendered, as to the questions of law involved.
Indeed, these questions are simple and well settled.   Our
disagreement arises entirely from the conflicting views we
entertain as to the character of Lowe's agency for Littleton & Lamar.   If he was their general agent to buy cotton,
it would seem that his principals would be bound to pay for
cotton sold and delivered to him for them, whether they
actually received it or not; but if he was only their special
agent, having limited authority, one who dealt with him as
agent, and who had full knowledge as to the limits within
which he, under the terms of his appointment, had
authority to bind his principals, was bound to act with
reference to this knowledge, and consequently could not
in law hold the principals liable for loss occasioned by acts
of the agent in excess of, or contrary to, his authority in
the premises.

Chief Justice Simmons and the writer are satisfied that
Lowe was only a special agent, and that in the performance
of his duties as such he was restricted by the terms set
forth in the letter to the bank.   If we are right in this
view, it was incumbent upon Short, knowing the facts, to
see to it that Lowe paid for each purchase by drawing upon
Littleton & Lamar with the requisite bill or bills of lading
attached to his drafts.   When Short accepted Lowe's individual check upon the bank, he did so at his own risk,
and could not hold Littleton & Lamar liable for the value
of the cotton sold and settled for in this manner, without
proving affirmatively that such cotton was actually received by them.   Even then, Littleton & Lamar would not
be liable if they in fact paid for the cotton by honoring
Lowe's draft, or drafts, which came to them through the

bank in pursuance of the terms under which Lowe was appointed agent and of their arrangement with the bank to supply him with money with which to pay for cotton purchased.

The evidence does not show that the particular cotton, the price of which is the subject-matter of this suit, ever went into the hands of Littleton & Lamar at all; and we therefore think the verdict in the plaintiff's favor was entirely unwarranted, and ought to be set aside.

*Judgment reversed.*

ATKINSON, Justice, dissenting.

Finding myself unable to agree to the conclusion reached by the majority of the court in the present case, I shall proceed to a statement of the reasons which seem to me to justify a contrary view.    It will be observed, upon an examination of the opinion filed by my brethren, that the real point of difference between us is as to the effect of the evidence submitted touching the character of the agency under and by virtue of which the agent acted in the purchase of the goods for the recovery of the value of which this action is brought.    For a statement of the necessary facts I refer to the opinion of the court, pronounced through Justice Lumpkin. It will be seen that the defendants had an agent who for them was authorized to buy cotton at the point designated, from any person whomsoever, without limitation as to quantity, quality, or price to be paid.    He had full power in the name of his principal to complete the contract of purchase.    He was at his general discretion to select the person from whom he would purchase, agree upon the price to be paid, the thing to be purchased (provided only it was cotton), to perform every needful act in the transmission of title from the sellers to his principal, including the acceptance of delivery of the thing sold.    Up to this point there was not the slightest limitation upon the authority of the agent.    In dealing with the seller, he in

all respects represented and was the *alter ego* of the principal; and this, according to my view, constituted him a general agent—one exercising general powers with respect to the purposes of the agency, as distinguished from one exercising powers with respect to a particular subject; nor does it occur to me that the mere fact that the scope of the agency did not extend beyond the purchase for the principal of one commodity in general, render it the less a general agency. My brethren agree that if the agency was general and not special, the principal is bound. The distinction between the two classes of agency has been so aptly stated by Mr. Justice Strong, speaking for the Supreme Court of the United States, in the case of Butler *v.* Maples, reported in 9th Wallace, page 766, that in support of my own view I take the liberty of quoting from his opinion as follows: "The distinction between a general and a special agency is in most cases a plain one. The purpose of the latter is a single transaction with designated persons. It does not leave to the agent any discretion as to the persons with whom he may contract for the principal, if he be empowered to make more than one contract. Authority to buy for a principal a single article of merchandise by one contract, or to buy several articles from a person named, is a special agency; but authority to make purchases from any persons with whom the agent may choose to deal or to make any indefinite number of purchases, is a general agency, and it is not the less a general agency because it does not extend over the whole business of the principal. A man may have many general agents—one to buy cotton, another to buy wheat, and another to buy horses. So he may have a general agent to buy cotton in one neighborhood, and another general agent to buy cotton in another neighborhood. The distinction between the two kinds of agencies is, that the one is created by power given to do acts of a class, and the other by power given to do in-

v 97-12

dividual acts only." Upon authority of the distinction thus stated, the writer is content to rest his judgment that the agency now under review was general, and not special as contended by the majority. If this premise be established, it is conceded by the majority that the position of the writer is sustained.

But I shall nevertheless undertake to examine the scope of the general agency, in the light of what my brethren treat as concurrent instructions limiting its scope, which are deducible from the letter quoted in the opinion of the court; and in doing so, I will in the outset endeavor to make a distinction between instructions from the principal to the agent which operate as limitations upon the power itself, and those instructions which relate to transactions between the agent and the principal, and between the agent and persons other than the seller dealing with him with respect to the same matter. The former inhere in and become a part of the power, and if known, affect third persons; the latter do not, and a disobedience of such instructions makes questions between the agent and his principal only. The scope of the agency in the present case comprehended the employment by the agent of such means as were necessary in the purchase of cotton. What means were to be so employed was left to the discretion of the agent; but after the purchase was in all respects complete, and the entire transaction, so far as the purchase was concerned, was concluded by a delivery of the cotton, then only did the alleged instructions apply. It will be seen that they in no way related to the contract by which the ownership of the cotton was changed, but related only to the manner in which the agent upon the part of his principal should perform the duty of payment. For his own protection against the infidelity of his agent, the principal required that in the event the agent should see proper to pay for purchases by draft upon the bank, bills of lading should be attached to drafts drawn by the agent upon the

bank to which the letter containing the alleged instructions was addressed, and in that event authorized the bank to honor the drafts, and if the bank had paid such drafts without requiring bills of lading, as instructed, the principal could not have been held liable thereon; but I find nowhere in the record any requirement that the agent shall purchase for cash or credit only, or that in payment for cotton he must at all events draw through the bank. The letter only guaranteed to the bank drafts drawn in accordance with its terms, and did not undertake to limit the agent as to the manner of payment. When, however, the cotton purchased had been delivered by the seller to the common carrier upon the order of the general agent, the liability of the principal to the seller for the purchase price was complete; and what difference could it make to the seller whether the agent thereafter obeyed instructions or not? It might affect the agent, and might affect the bank dealing with him, but not the seller. The violation of such instructions could not by any possibility affect, much less discharge, the liability of the principal for the price of the goods. Had the agent obeyed instructions, the bank might have paid the draft delivered by him to the seller; but it is impossible for me to understand how, in law or morals, the repudiation of the draft could discharge the principal frcm liability for the price of the cotton. That the cotton, for the purchase price of which this action was brought, was actually sold by the plaintiff, and by him delivered to the common carrier upon the order of the agent of the defendant who had competent authority to buy, cannot be disputed; and to say that the infidelity, misfeasance or nonfeasance of the agent for whose conduct the defendant is in no manner responsible should absolve his principal from the duty to pay, is equivalent to permitting the principal to take advantage of his own fraud, and this I cannot consent to sanction. I think my brethren have misconceived the scope of the agency in question, and have fallen in-

advertently into the error of confusing instructions to the agent as to the manner of his dealing with the bank, with limitations upon his part to act for his principal in the execution of the purposes of that agency; and, therefore, am of the opinion that the judgment should stand affirmed.